Case No. 24-1929 Ronnie Gibson Sr v. Nicholas Abate et al. Argument not to exceed 15 minutes per side. Ms. Fielstra, you may proceed for the appellant. Good morning. Good morning, Your Honors. May it please the Court, Hannah Fielstra on behalf of Ronnie Gibson Sr as the personal representative of the estate of Ronnie Gibson Jr. I would like to reserve five minutes for rebuttal, please. This is a tragic case which involves a pre-trial detainee, Ronnie Gibson Jr., who was brought into custody at Monroe County Jail in October of 2020. He tragically died by suicide when he hung himself using the telephone cord located in the holding cell. He presented to the jail with a history of mental illness. Specifically, he had bipolar disorder, suicidal ideations, and he previously attempted suicide the last time he was incarcerated in the Monroe County Jail. He was previously on suicide watch at that jail. This case was dismissed on a 12 v. 6 motion by the lower court. The lower court applied a slightly different standard, and that standard matters. This comes down to the second prong of the Farmer v. Renman case, and that prong is a subjective prong. The standard the lower court applied was whether a reasonable person could infer that the officers did not subjectively believe that there was a strong likelihood that Mr. Gibson would commit suicide. This is a reasonable inference, but it is not the only reasonable inference. The court should have decided or applied the facts of the complaint to whether a reasonable person could infer that the officer did subjectively believe that Mr. Gibson was strongly likely to commit suicide, and this difference matters. This is a very fact-based case. The state pled ample facts which show that Mr. Gibson was strongly likely to commit suicide, and the officers who encountered him at the jail during the four hours he was there. What was it that they learned that day that created a strong likelihood? They weren't seeing him in his cell at the time, and he said he wasn't feeling suicidal. So they knew about the prior, but also asked him about the present. They did know about the prior, and the prior is huge in this case. It shows that under a custodial setting, he is feeling suicidal at least in one instance, and it's important because that was the last time he was in that jail. So the last time he was in a custodial setting, he attempted suicide. Defendant Abate on that day learned through booking, and we know that he was familiar with Mr. Gibson, or we can reasonably infer that he was familiar with Mr. Gibson, because upon booking, he greeted him in a way that was familial, and it seemed like they had a previous encounter, and we know that Mr. Gibson was previously in this jail. So during the booking, he learned that not only was there a previous attempt in Monroe County Jail, that there were multiple previous attempts, that Mr. Gibson told the officer that he was on new psych medication, that he was in mental health court currently, that he was currently in treatment for drug and alcohol abuse. He had experienced recent significant loss in his family. A close family member had just committed suicide. He was nervous, he was depressed, he was hopeless, and he felt like things were worthless. These were all facts that specifically Defendant Abate was aware of during this booking. Eventually, Mr. Gibson made eight calls from the telephone in his cell, and that was the very telephone that he eventually used to hang himself. These calls were to his loved ones, and he said things like, I just want evidence that the officers knew what he was saying on the phone. I do not have specific evidence at this time. So if they didn't know, why does that factor into what you're saying? Because it's reasonable to infer that they could have known. There's evidence that they were doing rounds during these hours, where Mr. Gibson was implementing, more than likely, this plan to ultimately commit suicide. They're doing rounds, they can monitor him on CCTV, and ultimately his cell is in close proximity to the officer's station. So while we don't know right now, specifically, who knew what and when, in terms of the other officers involved, it's reasonable to infer that had they been doing these rounds, they weren't doing them with a blindfold on. They had ample opportunity to observe him. The records we do have at this phase, of course this is pre-discovery, and discovery would flesh out any of these specific details, because a lot of this is subjective. Does the evidence show, and I watched the videos, certainly agree this is a tragic case, does the evidence indicate whether an officer passing in the hallway, outside the cell, could have heard the conversations? In other words, was it a door with openings? Was it a solid door? It's difficult to know, especially because there's not audio. We don't know the distance and what can be heard when, and so that's not something I'm able to answer, unfortunately, at this time. But again, that's something that discovery would further develop factually. Your best guess is that if the officers had heard this, it would have been through their rounds. You're not suggesting that there was any capability to listen in on the phone calls as they were happening? I don't know that for sure, so I can't say that they were actively listening in. And I don't know to what extent or when these phone calls are reviewed, but there is the capability to listen to these phone calls at some point. I'm not able to say, in this case, when they were doing that or whether they were doing that, but it's something that could be developed in discovery. Additionally, because this involves a level of subjectivity that is difficult to show pre-discovery, these things are important because a lot of these facts do require development. Discovery will develop whether or why inmates in prisons often say that they're not suicidal when they are. They are isolated. They can't use telephones. They're put in a suit oftentimes. And so a lot of inmates don't want to go through those things, and so they might say. But how would that show that this officer knew or should have known, right, and drawn the inference that this person is at immediate risk of self-harm? If the answer to the question that the officer posed, are you suicidal, was no. Because the circumstantial evidence that was presented in Mr. Gibson's booking shows that he is a risk of suicide. Defendants and the lower court. I'm sorry to cut you off, but you're really putting the prisons to a difficult choice. If the rule that comes out of this case is that you're liable as long as you have a history, even though you say, I'm not thinking about that, that's not what I'm thinking of doing, they have to rely on the history. A lot of inmates, that's not great for, including not being able to make phone calls. So it seems complicated to me. I understand what Your Honor is saying, and to a certain extent I do agree with you. However, this is recent history, and he's saying that someone in his family has recently committed suicide. He's saying he recently suffered a loss. He's saying he currently is hopeless. He's currently depressed. He currently has no hope for the future, and these are feelings that he has in this moment. And so the defendants and the lower court both recognized that he did respond that he was not currently suicidal. And had he not, I might not be here today. But that would be direct evidence that he had the knowledge required that he was, that Mr. Gibson was strongly likely to commit suicide. We still have to consider the ample circumstantial evidence. And that evidence is the other answers to these questions. That evidence is that he was not happy and upbeat like the inmate and lawler. While defendants describe his behavior as normal, that doesn't carry weight at this stage, because he's seen pacing in his cell. He's seen picking up the receiver and looking. I have to say the contrast can't be happy and upbeat. I mean, most people coming to jail, that's a strange attitude to say that's normalcy, happy and upbeat. But those were the words that were used in the lawler decision. That obviously puts you way away from the problem. But I'm just saying that's not a benchmark. I'm not an expert on this, but I just can't believe most people coming into jails are happy and upbeat. Right. And I do agree with you, Your Honor. But what is the role of Helfenstein in this case? Is that because it comes after not relevant or is it relevant? It comes after. And so the apply the prior precedent. That is correct. And so the lawler court, which was decided in 2024, makes clear that the standard that applies to Mr. Gibson's case is whether or not an official had this subjective knowledge that Mr. Gibson was strongly likely to commit suicide. I see I'm out of time. Thank you. Morning. Good morning, Your Honor. Michael Berger on behalf of the defendants. We're here today because, as opposing counsel indicated, there was a jail death, Mr. Gibson. And I think the key component here that plaintiff's counsel was not going over is this is an individualized analysis between what each person subjectively knew and whether they acted reasonably in the face of what they subjectively knew. Now, when we're looking at Mr. Abate, he shows up. He is the booking officer. It is outlined in the pleadings. It is outlined or is demonstrated in the video. And Mr. Gibson tells him that he had had a prior suicide attempt in 2019. This particular incident happened on October 1st, 2020, so nearly a year beforehand. And if you consider the video, which the district court did not, though I think you can because of the references within the pleadings, you see that he indicates that sometimes he feels hopeless. Sometimes he had feelings of worthlessness. He's not indicating that's every single time. Plaintiff's counsel also indicated that there was a comment about the family member who had died by suicide. That's not indicative that Mr. Gibson in the particular moment is ready to commit suicide. How hard would it be to put someone in a cell without a phone with a cord? I will say, is that normal that everyone gets a cell with a phone and a cord? I'd love to be able to answer you for that question, but that's not in the record. It would seem that it depends. The answer I think generally would be it depends on the layout of each specific jail. And in this particular case, there was a cell that had a cord in it. I understand your concern of placing someone in there, but based on this record, I can't answer that question because we don't have any indication of how many cells had phones, how many cells did not have phones, anything like that. How do you respond to opposing counsel's discussion of the types of things she would want to examine in the discovery phase? Isn't that typically a summary judgment decision? I think we need to look at Iqbal and Twombly, which are obviously the cases that really set up the standards for pleadings. And they really suggest that just because you want discovery on a particular issue does not mean that you get past the pleading stage. You need to look at the facts that are specifically pleaded in the case and whether those facts fit in and fulfill the elements of the particular claim. Specifically for this case, are you saying it would be implausible to suggest or speculate that the officers were overhearing what was on these phone calls? Yes, Your Honor. And the reason I say that is because there are no timings set forth in the particular pleadings on this particular case, the amended complaint. There's no indication that the group of officers who apparently were doing rounding were walking by Mr. Gibson's jail cell and that at the exact same time he was on the phone. There's no facts pleaded that would suggest or imply that they would have been able to overhear that. So because there's that lack of factual allegations, that means that they have not been placed on that notice that there's a strong likelihood that Mr. Gibson was about to commit suicide. But in any event, getting back to Mr. Abate, which was where I was the first time, what we have set forth in the factual allegations there is the only thing he knew of was that Mr. Gibson had previously attempted suicide approximately a year beforehand. Many of the cases that are set forth in the briefing indicate that it's very common for inmates to go in and out of suicidal thoughts and be put in and out of suicide watch. So it really suggests that just because someone has been suicidal before does not mean that there's a strong likelihood they are about to commit suicide in this particular instance. So that is the reason why Mr. Abate was properly dismissed from this case. Then we look at the next two. The two that were in the video area, Mr. Doon and Mr. Uhl, they're looking at the video and as the district court indicated, it's within 60 seconds. These two observe Mr. Gibson starting to place the cord around his neck and start reacting to it. One ends up calling emergency, the other runs immediately there and start helping him. Not only did they not have noticed that Mr. Gibson presented a serious risk of suicide, they acted reasonably under the circumstances. And then the next group of persons, which Judge Reitz was already talking about, as I just indicated, there's nothing in the pleadings that would suggest that they overheard anything that Mr. Gibson said on the phone. There's nothing in the pleadings that suggests that they were able to overhear the actual phone calls because they were listening in on them, anything like that. So it is complete speculation that they would have been placed on notice that he presented a serious risk of suicide. So the district court properly dismissed them as well. The final defendant is the municipality, and in this particular case, because there is no constitutional violation, as I've just outlined, is properly dismissed. But then we look at the actual allegations, which I've outlined in my brief. You'll see that each one of those were conclusory allegations. When we come to the training and supervision aspect of it, there's nothing out there that indicates that there was training that did not happen, what the trainings were, why they were insufficient, why it was not supervised. It's just conclusory allegations, which is insufficient under Iqbal and Twombly. And then there was also some allegations of ratification because there were prior suicides. But because the allegations of prior suicides are not sufficient to set forth a ratification theory, because there needs to be a history outlined in the complaint that these people, the county in this particular case, had constantly ignored the fact that there were prior suicides. They ignored persons who were a serious suicide risk, and there's nothing in the pleadings for that. Going back to your, that the facts that are pledged just don't show a strong likelihood of suicide. If asking the question, are you suicidal now, and getting a negative answer negates anything else that may have been asked, what's the point of all those questions that were in that, that the officer asked of Mr. Gibson? I apologize if that's the way that's come off. I don't believe that just receiving a negative response totally negates everything. It is a totality of the circumstances type of analysis. You need to be looking at how the person has been reacting. History is fine. History is an important aspect of it, but it needs to be a recent history. If you are aware of some sort of things that a particular person has, maybe texts or something like that that suggest they are going to go into a suicidal aspect, I think that's important. But when you're looking at the allegations in this particular complaint, the only thing that they have in there that would try to place anyone on notice is, I tried to commit suicide in 2019, approximately a year ago. And when we look at the video in this particular case, there's nothing in there that indicates that he is going to commit suicide in this particular instance. As Chief Judge Sutton noticed in the other part of the oral argument, of course he's a little bit upset. He's getting dragged to jail. That's very common. I don't know of anyone that would be happy during the booking process. So there's nothing uncommon here for Mr. Gibson to place anyone on notice that he is a serious suicide risk. So I hope that answers your question. I still find it so strange that you're very careful about all these questions, and then once you decide not a serious risk, you jump all the way to the, you can be in a cell with a cord. I mean, you would agree this would be outrageous if all that was there was a piece of rope, right? I mean, that would be outrageous. I think a piece of rope would probably be outrageous because there really isn't much other purpose for having it in a cell. So why not just say, we don't think we're going to leave a phone there. And then he says, please, can I just, I want to talk to these three people. And then they're like, okay, fine. We'll sit outside, and then we'll take the phone. It just seems so many obvious things. Good for your clients for asking all these questions, but it's just so strange to say we don't think there's a current risk in spite of all of this. And then boom, you might as well just have a rope there. A rope only really serves one purpose. That's an intent point. That's why it's outrageous, but it has nothing to do with opportunity. I hear what you're saying, but I think in this particular case, we're looking at a cell that Mr. Gibson, he needs to be in a cell. Generally, I would assume phones are placed in the cells so that people can make phone calls and have those conversations. I think that's complicated. I agree with that. Hypothetically, if this court were to make some sort of bright line rule indicating that this should not have happened, we're looking at something that has not been clearly established and qualified immunity would apply, which would make the dismissal appropriate. But I think in this particular instance, because there was no serious indication that Mr. Gibson was a suicide risk, it's probably not the best idea to place him in a cell with a phone. But it isn't something that would trigger in someone's mind, oh, he's going to use this to start wrapping around his neck and commit suicide. It's something that maybe shouldn't be done. It's a learning experience. But at the same time, I think it would probably be fine because he's being placed in a cell, no particular suicide risk. Why shouldn't he be allowed to call family and friends, let them know what's going on, where he is, see if they can get him set up for suicide. If not, for bail money, anything like that, for the next steps in the process that he's going to be dealing with in the morning. Otherwise, if no one has any other questions, I would ask that the court affirm. Thank you very much. Here's some rebuttal. Your Honors, the death of a 40-year-old man is a high price to pay for a learning experience. The bottom line is, he was given the tools to commit suicide by hanging in his cell, and unfortunately, he followed through with that. I do believe that under these circumstances, given the circumstantial evidence, given the totality of the circumstances, given the fact that he was hanging in his cell, given what Defendant Abate knew during the booking, and what other officers reasonably could have observed, either on surveillance or through the rounds, the telephone that was located in his cell is akin to a piece of rope. Because he chose to use it like one. The bottom line... That's a nice thing to do. Not all prisons have ready access to phones. There's some compassion involved in that choice as well. While that may be true, it turned into a tool that was used to commit suicide. He also used that same tool to make suicidal threats to his loved ones. He may not have chosen if they did when, but he used that as a means to commit suicide. The bottom line here is that the estate pled facts from which an inference can be drawn that Mr. Gibson was strongly likely to commit suicide, and these officers had the subjective knowledge of those circumstances. On the one end of the spectrum, we briefly discussed the Lawler case, where the plaintiff was happy and upbeat. His previous suicide attempt was over a decade ago, and I believe the father described that attempt as experimental. This court has also found deliberate indifference in two other cases that are similar to this one. Schultz v. Stillman, where the officers knew about the past attempt of suicide, knew that his suicide was triggered by the fact that he had kidney problems and ignored the cries for help. Here, we have at least one officer who was aware of the previous suicide, who could reasonably be inferred that that officer was aware that that suicide was potentially triggered by being in a correctional setting, which we have again here. He knows that the last time he was in Monroe County Jail, he tried to hang himself. Unfortunately, he ignored the other signs of suicide risk in the answers to those questions. He ignored the fact that he said that he's depressed, hopeless. All of these different factors that play into whether or not someone is suicidal. We also have the case Perez v. Oakland County, where this court found deliberate indifference. An officer was aware of a threat of suicide. An officer was aware of an attempt of suicide. That inmate had previously been on suicide watch at the jail and was taken off suicide watch. Court found deliberate indifference in that case. Similarly, here, the officer has knowledge of a previous suicide attempt. Because it was an attempt, it was a threat of suicide as well. If the court isn't persuaded by that fact and can potentially be persuaded by the fact that he's making these threats on the phone and has fairly abnormal behavior in his cell, pacing back and forth, picking up the receiver, looking around. We don't know if he was looking around to see if anyone was listening or watching. Unfortunately, he's not here to tell us what that behavior was for. But he was previously on suicide watch at the Monroe County Jail and was not put on suicide watch this time. In the very least, that should have been done. For officers Uhl and Dunn, do you have a case that we can look at to show that a 60-second response time was deliberate indifference? I do not, Your Honor. I think the main claims in this case really relate to my client's behavior during the booking and while he was in his cell prior to him hanging himself. If there are no other questions, I will rest. Thank you. All right. Thank you very much. Thanks to both of you for very helpful briefs and for excellent oral arguments. We really appreciate it. The case will be submitted.